UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
AUG 0 4 2017
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

YAN ZHAO,

          Plaintiff,

      v.

UNITED STATES OF AMERICA,

          Defendant.

**DECISION AND ORDER**

1:06-CV-00106 EAW

## INTRODUCTION

Over thirteen years ago, an incident occurred near the Rainbow Bridge in Niagara Falls, New York, that attracted worldwide attention and generated significant criminal and civil litigation.[1] The actual incident was over in a matter of minutes, but the repercussions have lasted for over a decade. This Decision and Order arises out of the Court's handling of the bench trial, held over the course of approximately four weeks in May and June 2015, of the civil lawsuit commenced by plaintiff Yan Zhao (hereinafter "Zhao" or "Plaintiff") against defendant the United States of America (hereinafter "the Government" or "Defendant") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (the "FTCA").

---

[1] As noted by the Honorable William M. Skretny, United States District Judge, in his Decision and Order entered on June 14, 2013, this is the fourth lawsuit arising out of the events in question: there was a criminal prosecution against U.S. Customs and Border Patrol Officer Robert Rhodes III, which resulted in his acquittal, and two civil lawsuits initiated by Rhodes against the Government, which were ultimately dismissed. (*See* Dkt. 112 at 2 (describing other litigation and results)).

The incident underlying this litigation occurred on July 21, 2004, when Plaintiff, who was visiting the United States from China, was mistaken by U.S. Customs and Border Patrol Officer Robert Rhodes III (hereinafter "Rhodes") as a drug smuggler, resulting in an assault from which Plaintiff contends she suffered significant injuries. Having conducted a bench trial in which 18 witnesses testified and hundreds of exhibits were admitted, and after considering all the evidence, the Court finds that Plaintiff has carried her burden of proof to establish, by a preponderance of the evidence, that Rhodes used excessive force on July 21, 2004. However, while the use of excessive force was unlawful and Plaintiff suffered injuries as a result, the assault was not nearly as damaging as claimed by Plaintiff, and the injuries suffered by Plaintiff do not even approach the magnitude she claims. For the reasons set forth below, the Court determines that Plaintiff has established her entitlement to recover four hundred sixty-one thousand one hundred fifty-two dollars and nine cents ($461,152.09) in damages for the injuries that she has proven she suffered as a result of Rhodes' actions. This Decision and Order constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## PROCEDURAL BACKGROUND

Plaintiff commenced this action on February 17, 2006, by filing a Verified Complaint pursuant to the FTCA. (Dkt. 1). Plaintiff filed an Amended Complaint, the operative pleading, on July 28, 2006. (Dkt. 10). Defendant filed an answer on July 31, 2006. (Dkt. 11).

After discovery was completed, both parties filed dispositive motions. (Dkt. 92; Dkt. 96). By Decision and Order filed June 14, 2013, Judge Skretny granted Defendant's

motion pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss Plaintiff's claims directed to the alleged negligent hiring, training, supervision, and retention of Rhodes, as those claims involved discretionary determinations and the FTCA did not waive sovereign immunity for any such claims, and denied Plaintiff's motion for partial summary judgment. (Dkt. 112). The Court construed Plaintiff's remaining allegations as asserting claims for assault, false arrest, and excessive force. (*Id.* at 14 n. 6).

On October 24, 2014, the case was reassigned to the undersigned. (Dkt. 127). A bench trial commenced on May 11, 2015, and continued through June 9, 2015. (Dkt. 188; Dkt. 206). Prior to commencement of the bench trial, the parties filed several motions in limine, of which the following remain pending: (1) Defendant's motion in limine related to non-economic loss issues, to the extent that it sought to exclude certain of Rhodes' personnel records and evidence of the Report of Investigation ("ROI") generated by the Department of Homeland Security, Office of Professional Responsibility (Dkt. 131); (2) Defendant's motion in limine related to economic loss issues, to the extent that it sought to preclude Plaintiff from seeking certain economic damages and to exclude the testimony of Plaintiff's accounting expert, William A. Hanlin (hereinafter "Hanlin") (Dkt. 134); and (3) Plaintiff's motion in limine, to the extent that it sought to preclude evidence that Plaintiff failed to comply with commands given by Rhodes (Dkt. 137).

Following the bench trial and in accordance with the Court's direction, Defendant submitted proposed findings of fact and conclusions of law on February 16, 2016. (Dkt. 220; Dkt. 221). Plaintiff submitted proposed findings of fact and conclusions of law on

February 17, 2016. (Dkt. 222; Dkt. 223).[2] Both Plaintiff and Defendant filed responses to the other party's initial submissions on March 25, 2016. (Dkt. 229; Dkt. 230; Dkt. 231; Dkt. 232).[3] With the Court's permission, Plaintiff amended her response to Defendant's proposed conclusions of law on April 1, 2016. (Dkt. 234). Defendant filed supplemental submissions on April 8, 2016, and Plaintiff filed a supplemental submission on April 9, 2016. (Dkt. 235; Dkt. 236; Dkt. 237).

## FINDINGS OF FACT

The following section constitutes the Court's Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a)(1). The Court has made its Findings of Fact based on the testimony and exhibits presented at trial, and has discussed only those issues considered "material to the resolution of the parties' claims." *Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-CV-00690-JJM, 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016) (citations omitted). Moreover, "the distinction between law and fact is anything but clear-cut" and

---

[2]    Plaintiff's initial proposed findings of fact and conclusions of law were submitted one day past the Court's deadline of February 16, 2016. (*See* Dkt. 213). The Court conducted a status conference on February 23, 2016, and its remedy for the late filing was to allow the Government to submit its papers in response to the initial filing one day after the deadline set for Plaintiff. (*See* Dkt. 225; Dkt. 227).

[3]    The Government submitted its response to Plaintiff's post-trial conclusions of law at Docket No. 231, and its response to Plaintiff's proposed findings of fact at Docket No. 232. However, with the exception of the exhibits attached to Docket No. 232, both documents were the same, and appeared to consist solely of the Government's response to Plaintiff's proposed conclusions of law—in other words, it does not appear that the Government submitted a response specifically addressing Plaintiff's proposed findings of fact. For purposes of efficiency, the Court refers to the filing at Docket No. 232, since while characterized as a response to proposed findings of fact, this document responds to Plaintiff's proposed conclusions of law and attaches exhibits in support of the Government's submission.

therefore, "for purposes of appellate review, the labels of fact and law assigned" should not be considered controlling. *Id.* (citations and internal quotations omitted).

## I.     Burden of Proof

Unless otherwise noted, Plaintiff bears the burden to prove her case by a preponderance of the evidence—in other words, Plaintiff must establish that the facts underlying her claims are "'more likely true than not true.'" *Brown v. Lindsay*, No. 08-CV-2182, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010) (quoting *Fischi v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

## II.    Plaintiff's Credibility

Plaintiff testified at the trial over the course of five days.  Many aspects of this case rise and fall on Plaintiff's credibility.  In particular, the damages claimed by Plaintiff are largely a function of her claims about her pre-incident health and business activity, very few of which have any sort of independent verification.  Accordingly, and as a threshold matter, the Court will explain its assessment of Plaintiff's credibility.

The Court did not find Plaintiff to be a credible witness.  The Court's assessment of Plaintiff's credibility is based on its observations of her at trial, including her demeanor and conduct, as well as her testimony and the testimony of other witnesses. The Court found Plaintiff evasive and not forthcoming.  She often failed to answer the question that was asked of her and appeared as though she was attempting to hide information.  Plaintiff repeatedly appeared to testify to matters that <u>she</u> wanted to discuss, as opposed to answering the questions put to her.

Plaintiff testified that she only knew a few English words at the time of the incident with Rhodes, that she had subsequently taken English classes, and that she is now able to understand simple words and sentences. (Dkt. 208 at 16:6-17). However, the Court's observations throughout trial, as well as the testimony of other witnesses, indicated that Plaintiff's ability to speak English is far greater than she has claimed. On several occasions, she corrected or interrupted the interpreter who was translating English into Mandarin Chinese (and vice versa), and she also clearly understood and responded to her counsel's objections, at times altering her testimony in response to those objections (made in English). (*See, e.g.*, *id.* at 14:2-5, 43:21-24, 220:5-17). Plaintiff was also able to review documents written in English and confirm their content. (*See, e.g.*, *id.* at 34:23-36:20). Moreover, Customs and Border Protection Officer Amina Zinnerman (hereinafter "Zinnerman"), who the Court found extremely credible and who witnessed Rhodes' attack on Plaintiff, testified that Plaintiff told her in English on the night of the attack that she had a cell phone in her purse and asked Zinnerman to contact her friend. (Dkt. 211 at 42:5-13). Plaintiff's lack of candor regarding her ability to speak English played a role in the Court's assessment of her credibility.

The Court was also troubled by other conduct by Plaintiff. She frequently behaved as though she were putting on a show for an audience. For most of the trial, the number of spectators was fairly limited (and at some points, non-existent). However, at one point during the trial, a group of students entered the gallery of the courtroom, on an apparent tour of the courthouse for school. Plaintiff's demeanor changed noticeably upon entry of the students. She quite suddenly became extremely dramatic and emotional, and

began to cry loudly, apparently in an attempt to create sympathy for herself. With the students in the audience, Plaintiff offered testimony that she wanted to provide, resorting to information that had already been covered as opposed to responding to counsel's questions.

There was also evidence that Plaintiff was not forthcoming with her health care providers. Between the incident in 2004 and the time of trial, Plaintiff sometimes lived in the United States and sometimes lived in China. While she was in the United States, she was treated by Jianping Chen, M.D., Ph.D. (hereinafter "Dr. Chen"), a psychiatrist. (Dkt. 219 at 3:20-4:4). When Plaintiff first met Dr. Chen, she told him that she was married and that she had a ten year old son. (*Id.* at 238:21-239:6; *but see* 246:18-21 (testifying that Plaintiff told him that she had "no friends or relatives for support in this country")). Dr. Chen subsequently learned that Plaintiff was not married and that she did not have a son. (*Id.* at 239:23-240:6; *see id.* 247:7-12 (testifying that Plaintiff's statements that she did not have any close friends in New York were not accurate)). Significantly, Dr. Chen took Plaintiff's history in Mandarin, so there is no indication that her inaccurate statements were the result of a language barrier. (*See id.* at 238:17-18). Plaintiff also would not provide Dr. Chen with contact information for her physicians in China, claiming that it made her uncomfortable. (*Id.* at 423:10-20).

Similarly, when Plaintiff met with Steven Stein, Ph.D. (hereinafter "Dr. Stein"), a neuropsychologist and clinical psychologist (Dkt. 218:11-14), she told him that she was married to a man named Linton and that she had a ten year old son who was the product of that relationship (*id.* at 212:5-12). Dr. Stein subsequently learned that Plaintiff was not

- 7 -

married and that she no longer claimed that the child in question was her biological son. (*Id.* at 212:13-22).

Plaintiff has attempted to account for these inconsistencies in her recitations of her personal history by asserting that she essentially served as a surrogate mother to her nephew, Wang, after his parents divorced,[4] and that she was in a long-term relationship with a man named Gui Lai Zhao as of July 21, 2004, which she considered a form of marriage. (Dkt. 208 at 11:8-12:11, 247:17-249:10). However, even if the Court credited these statements by Plaintiff (which it does not), she has offered no explanation for why she told Dr. Stein that Wang was her biological child when he clearly was not.[5]

As discussed in more detail below, Plaintiff claims to have founded a business in China prior to the incident at issue, but she has been unable to provide any meaningful detail regarding the nature of this enterprise and, in fact, she has made a number of inconsistent statements about the precise type of business it purportedly conducts. At

---

[4] Plaintiff sometimes referred to her nephew as her "adopted" son (*see, e.g.*, Dkt. 208 at 305:20-22), but it is not clear that he was ever adopted in any legal sense.

[5] Plaintiff has argued that her marital and parental statuses are collateral issues and that extrinsic evidence as to these points is not admissible under Rule 608(b) of the Federal Rules of Evidence. (*See* Dkt. 229 at 61-62). To be clear, the Court's consideration of this issue does not rely on consideration of extrinsic evidence (including any forms completed by Plaintiff) and is based on Plaintiff's testimony at trial. Moreover, the Second Circuit has expressly held that "it can be appropriate to introduce false statements . . . under Rule 608(b)(1) to shed light on a witness' credibility." *United States v. Triumph Capital Grp., Inc.*, 237 F. App'x 625, 629 (2d Cir. 2007). To the extent Plaintiff contends that evidence on these issues should have been excluded as more prejudicial than probative (*see id.* at 62-63), the evidence is probative of her credibility, and she has failed to identify any undue or improper prejudice. *See Triumph Capital Grp., Inc.*, 237 F. App'x at 629 (stating that "the district court was well within its discretion in finding that any danger of unfair prejudice from the allowed cross examination did not substantially outweigh its probative value").

trial, Plaintiff claimed that her business produced fitness equipment and that she had plans to branch out into furniture manufacturing (Dkt. 208 at 24:19-22, 30:13-16), yet she told Dr. Chen that she was the general manager of a clothing manufacturing company and was branching out into the medical supply business (Dkt. 219 at 22:5-12; 242:23-243:11, 309:9-12), and she told Dr. Stein that she owned a clothing company that also sold nutritional products (Dkt. 218 at 45:11-14). Again, Plaintiff's changing and inconsistent statements are not indicative of credibility, nor is her lack of candor with her health care providers.

The Court further notes that Plaintiff made inaccurate statements on an Affidavit of Financial Resources submitted to the New York State Crime Victims Board (hereinafter the "Crime Victims Board") in September 2004. (*See* Government's Trial Exhibit 553). Specifically, Plaintiff indicated on the form that she had 50,000 Chinese yuan (¥) in savings and that she owned no stocks, bonds, or real property. (*Id*). However, at trial, Plaintiff testified that as of 2004 (and continuing to the present) she owned two houses (*See* Dkt. 208, at 116:18-118:2), and that she had many different accounts in China and the ¥ 50,000 she listed was just "one of them" (*id*. at 305:8-11). Plaintiff has asserted that she is not responsible for these statements because she merely signed the document and was assisted in completing it. (*See* Dkt. 230 at 26). The Court does not find this explanation compelling. Plaintiff testified at trial that the information on the form came from her. (*See* Dkt. 208 at 301:16-19).

Certain aspects of the testimony of Francisco Lopez (hereinafter "Lopez"), Plaintiff's husband, also caused the Court to question Plaintiff's credibility. Lopez, who

met Plaintiff in 2006 and has been married to her since 2010 (Dkt. 209 at 49:14-22), testified that he called Plaintiff "Helen" and that she went "through extreme[s] to hide her name" because she felt "her name [was] a burden on her" and that nobody in his family knew Plaintiff by her real name (*id*. at 52:18-53:6). This testimony by Lopez confirmed the Court's impression that Plaintiff is not a forthcoming person, even with people who are close to her, and that she tries to control information and shape others' perceptions of events to fit her agenda.

When this Court presides over jury trials, it instructs the jurors to assess the credibility of witnesses using the common sense tests they apply in their everyday lives, including their impressions of the witness' demeanor, frankness, openness, evasiveness, accuracy, and bias. Applying these tests with respect to Plaintiff, the Court did not find her to be a credible witness. Because the Court did not find Plaintiff credible, it has generally given little credit to her testimony. Accordingly, the Court's Findings of Fact have been guided by where there is independent corroboration for Plaintiff's claims and where there is not.

III. **Plaintiff's Pre-Incident History**

Plaintiff was born on April 19, 1976, in Tianjin, China. (Dkt. 208 at 5:18-22). She claimed she graduated from college (*id*. at 7:20-23), and to have been certified as a music educator (*id*. at 8:22-9:6), but was not sure when that occurred (*id*. at 17:6-8). Following her college graduation, Plaintiff reported working as a high school music teacher for approximately 12 years. (*Id*. at 9:11-15, 17:13-21). She claimed to have subsequently worked in a number of different fields, which included the sale of air tickets

with a friend as well as jewelry at a kiosk, and the ownership of a food court restaurant. (*Id*. at 18:2-9).

Plaintiff testified that she founded a company called Tianjin Zhaomiao Limited Company (hereinafter "TZLC") in 2001. (*Id*. at 20:23-21:18). According to Plaintiff, she invested approximately ¥ 1,000,000 into TZLC, and she owned 80% of the company, while a friend, named Ginwen Gi, owned 20%. (*Id*. at 21:19-22:17). Plaintiff further testified that TZLC had two locations and sold fitness equipment (*id.* at 23:10-24:3), though, as noted above, she told Drs. Chen and Stein otherwise. Plaintiff claimed to have eventually bought out Ginwen Gi's interest in TZLC. (*Id*. at 25:7-17). Plaintiff testified that she was the general manager of TZLC and that it was largely her personal contacts and connections that enabled her to enter into agreements for the production of fitness equipment. (*Id*. at 25:18-26:18). Plaintiff claimed that, at the time of the incident with Rhodes, she had plans to enter into additional business areas, including furniture and decoration. (*Id*. at 29:13-30:12).

## IV.   **The Incident**

In or about May of 2004, Plaintiff apparently met in Beijing with representatives of the Pennsylvania Department of Community and Economic Development to discuss the possibility of TZLC establishing an office and purchasing a furniture manufacturing facility in Pennsylvania. (*See* Trial Exhibit 128 at 1). Plaintiff and her associates were to visit Pennsylvania from June 21, 2004, to June 25, 2004, to "learn[] about the work and living environment in Pennsylvania" and to visit potential business sites. (*Id*.). Plaintiff did subsequently come to the United States and attend meetings in Pennsylvania, after

which she traveled to New York State to visit her friend Jennifer Shell. (Dkt. 208 at 39:24-40:10). Plaintiff initially took a bus to New York City (*id*. at 40:15-20), and left for Niagara Falls on July 21, 2004, as part of a tour group (*id*. at 45:9-14). During the bus trip from New York City to Niagara Falls, Plaintiff met two other Chinese women, Xie Fang and Ming Huang. (*Id*. at 46:6-12).

After dinner on July 21, 2004, the tour guide suggested that the group go to the Rainbow Bridge, and then to the Niagara State Park to view Niagara Falls at night. (*Id*. at 46:23-47:3). Xie Fang suggested that she, Plaintiff, and Ming Huang take a picture by the Rainbow Bridge, and the three women walked together to the park. (*Id*. at 47:4-11). As Plaintiff and her companions walked closer to the Rainbow Bridge, two men told them that they could not walk past a certain point because they were not United States citizens and did not have a Canadian visa. (*Id*. at 50:4-12). Plaintiff and her companions intended to take a photograph of themselves beneath a sign that said "to Canada." (*Id*. at 50:13-16).

On July 21, 2004, Rhodes was assigned to work at the bus terminal at the United States-Canada border in Niagara Falls. (Dkt. 207 at 12:12-15). Rhodes was first employed by the United States Custom Service in 1987 and, at the time of the incident, was a Customs and Border Protection Officer. (*Id*. at 7:13-24, 12:12-17). At approximately 11:15 p.m., Rhodes was sitting in booth number two at the bus terminal when a man who later became known to him as Dennis Leathers (hereinafter "Leathers") approached in order to be cleared to enter the United States from Canada. (*Id*. at 13:22-14:4). Rhodes cleared Leathers for entry. (Dkt. 228 at 22:16-20). Customs and Border

Protection Officer Angelo Arcuri (hereinafter "Arcuri"), who was also assigned to the bus terminal that evening, subsequently observed that Leathers had a protruding bulge in his lower back. (*Id.* at 22:24-23:4). Arcuri approached Leathers and asked him "what he had." (*Id.* at 23:23-25). Leathers and Arcuri engaged in a physical confrontation, which ended with Arcuri handcuffing Leathers. (*Id.* at 24:10-23). Arcuri discovered that Leathers had marijuana on his person, and asked Leathers "who is with you, who is with you?" (*Id.* at 44:25-45:6). Leathers stated that he was alone and that it was his marijuana. (*Id.* at 45:4-6). Arcuri asked Rhodes who else had come in with Leathers, and Rhodes indicated that Leathers had been accompanied by a light-skinned black woman and two Asian women. (*Id.* at 48:9-50:3). Rhodes then radioed for additional assistance but, rather than wait for assistance to arrive, he ran out the door. (*Id.* at 50:23-51:5).

As Plaintiff and her companions began walking back to their hotel, she observed a black man with a white shirt (presumably Leathers) lying on the ground in the bus terminal and saw "a cop staying by him and waving to us." (Dkt. 208 at 54:10-13). Plaintiff's companions stated that the "cops" probably needed help, at which point the "cop [Rhodes] [ran] out into [them]." (*Id.* at 54:13-15).

Unsurprisingly, Rhodes' and Plaintiff's versions of their encounter vary dramatically. To be clear, while Plaintiff was not a credible witness, the Court also did not find Rhodes credible and does not credit his version of these events. His demeanor and conduct at trial were not indicative of credibility, and he was contradicted in several key regards by other witnesses, whom the Court did find credible. The portions of

Plaintiff's testimony that the Court has credited are included in its description of the incident, but for the most part, the Court bases its Findings of Fact as to the incident on the testimony of the other witnesses.

As Rhodes ran towards Plaintiff, her companions ran away, but she did not. (Dkt. 208 at 58:11-22). Rhodes immediately took out a can of pepper spray and began spraying Plaintiff. (*Id.* at 59:3-25). Customs and Border Protection Officer Emmett Russell ("Russell") was working at the Rainbow Bridge that evening and received a call for help over the two-way radio. (Dkt. 209 at 5:20-6:7). He headed towards the bus terminal and, on arrival, observed Plaintiff and Rhodes near the pedestrian exit. (*Id.* at 8:11-16). Russell saw Rhodes "forcefully propel[]" Plaintiff into the side of the building (*id.* at 12:3-10), and saw that her head hit the wall as she rebounded off it (*id.* at 12:11-13, 14:15-18). Russell testified that he never heard Rhodes give Plaintiff any commands (*id.* at 14:22-15:6) and that Zinnerman, who had accompanied him to the bus terminal, also saw Rhodes throw Plaintiff into the wall and said "oh, shit." (*Id.* at 15:12-16:7). Zinnerman testified that she witnessed Rhodes throwing Plaintiff (Dkt. 211 at 15:6-14) and that she could feel the effects of the pepper spray Rhodes had used on Plaintiff (*id.* at 16:15-18). Russell and Zinnerman began trying to handcuff Plaintiff. (Dkt. 209 at 19:10-21:4, 23:22-25). Zinnerman testified that Plaintiff was on her knees face down in the fetal position when Zinnerman reached her (Dkt. 211 at 18:5-10), and that Rhodes subsequently took Plaintiff's hair into his hands, kneed Plaintiff in the head three times, and slammed her head into the ground twice (*id.* at 21:3-23). Zinnerman never observed Plaintiff trying to strike or kick any officer, nor was she flailing or moving her arms

- 14 -

around. (*Id.* at 26:20-27:2). Russell also testified that he did not observe Plaintiff being "assaultive," nor did he consider her a threat to himself or anyone else. (Dkt. 209 at 18:2-25). Zinnerman testified that Rhodes was larger and taller than Plaintiff (*see* Dkt. 211 at 19:25-20:10), and the Court's own observations at trial confirmed that Plaintiff is a small woman and that Rhodes is significantly larger. Russell also witnessed Rhodes kneeing Plaintiff in the head (Dkt. 209 at 26:17-24) and grabbing Plaintiff by the hair and slamming her head into the ground (*id.* at 28:9-18). Plaintiff was stationary at that time. (*Id.* at 29:7-9). Russell put his hand on Rhodes' shoulder and said Rhodes' name in a "directing him to stop type way," at which point Rhodes stopped and Russell and Zinnerman were able to finish handcuffing Plaintiff and stand her up. (*Id.* at 29:10-22, 32:19-33:3). Russell testified that the amount of force he observed Rhodes using was unreasonable. (*Id.* at 31:2-7). Russell estimated the time between when he first saw Rhodes and Plaintiff and when Plaintiff stood up was no more than two minutes, while Zinnerman testified that it was "maybe" two to three minutes. (*Id.* at 41:11-18; Dkt. 211 at 44:13-18). The Court found Russell and Zinnerman extremely credible and accordingly fully credits their description of Rhodes' actions towards Plaintiff, which are consistent with one another.

## V.     Investigation of the Incident and Prosecution of Rhodes

On July 21, 2004, Steven MacMartin (hereinafter "MacMartin") was a senior special agent with Immigration and Customs Enforcement's Office of Professional Responsibility ("OPR"). (Dkt. 211 at 51:7-14). MacMartin testified at trial, and the Court found him credible. On the night of the incident at issue, he received a call from

the Rainbow Bridge, and eventually spoke to Supervisor Customs Inspector Mahady (hereinafter "Mahady"). (*Id.* at 52:20-53:7). MacMartin's investigation of the incident in question resulted in production of the ROI, which is also sometimes referred to as the "Redbook." (*Id.* at 54:6-15).

Mahady informed MacMartin that there had been an incident involving a civilian and that two Customs and Border Protection officers had alleged that a third officer had kneed and/or knocked the civilian in the head while she was on the ground, and that she had been pepper-sprayed. (*Id.* at 55:16-56:5). MacMartin began his investigation immediately by calling his partner and supervisor and traveling to the Rainbow Bridge to interview the involved parties, including Plaintiff. (*Id.* at 56:24-57:4). The next day, MacMartin spoke with individuals from the U.S. Attorney's Office to inform them of his preliminary findings, one of whom requested that MacMartin begin preparing an affidavit in case it became necessary to obtain a search warrant. (*Id.* at 85:20-86:25). MacMartin prepared such an affidavit, in which he stated that there was probable cause to arrest Rhodes for having unlawfully deprived Plaintiff of her rights to personal security and liberty without due process of law. (*Id.* at 87:17-88:8; *see also* Trial Exhibit 36). A search warrant was issued to permit a search of Rhodes to ascertain whether he had been injured during the incident; the search was performed the following morning and did not reveal "very many extensive injuries" on Officer Rhodes. (*Id.* at 88:9-89:8).

On August 11, 2004, a federal grand jury returned an indictment charging Rhodes with a one-count violation of 18 U.S.C. § 242, Deprivation of Rights Under Color of

Law. (*See* Case No. 1:04-cr-00196-RJA-HBS, Dkt. 3). Rhodes was tried before a jury and found not guilty on September 8, 2005. (*See id.* at Dkt. 100).

## VI. Plaintiff's Injuries and Medical Treatment

### A. Injuries and Treatment in the Immediate Aftermath of the Incident

Following Rhodes' attack on Plaintiff, Zinnerman and Russell escorted her back to the terminal. (Dkt. 209 at 32:19-24). Zinnerman and Russell did not observe Plaintiff lose consciousness at any point during the incident, and she was conscious when brought to a standing position. (Dkt. 209 at 42:23-25; Dkt. 211 at 38:10-12, 40:2-4, 40:21-41:3). Plaintiff walked into the building under her own power. (Dkt. 209 at 43:16-18). Russell observed that Plaintiff's eyes and cheeks were very red and swollen (consistent with the use of pepper spray) and that she had a laceration on her forehead. (*Id.* at 34:20-36:13). Zinnerman washed Plaintiff's eyes with a saline-type solution and observed that she had swollen eyes, bruising and abrasions on her face, and a knot on her head. (Dkt. 211 at 24:7-25:11). Photographs of Plaintiff taken after the incident are consistent with Zinnerman's and Russell's descriptions of her injuries. (*See* Trial Exhibits 151, 402-410).

Cheri Schmitt (hereinafter "Schmitt") was working as an Advance Life Support ("ALS") paramedic for Rural Metro Services on July 21, 2004. (Dkt. 211 at 100:23-101:3, 103:21-104:10). Schmitt testified at trial and the Court found her credible. At approximately 11:30 p.m., she received a call to report to the Rainbow Bridge, where she arrived at 11:36 p.m. (*Id.* at 105:10-14). Schmitt understood the call to be in regard to an allergic reaction. (*Id.* at 105:15-19). When Schmitt arrived at the Rainbow Bridge,

Plaintiff was conscious, alert, and oriented. (*Id.* at 128:14-15). Schmitt assessed Plaintiff pursuant to the Glasgow Coma Scale and gave her a score of 15, representing the highest level of consciousness. (*Id.* at 128:19-129:5). Plaintiff's chief complaint was facial pain, her respiration and pulse were normal, and she was not suffering from any cardiac issues. (*Id.* at 113:2-14, 126:13-23, 127:22-24). Schmitt observed that Plaintiff's eyes were bruised and that she had pooling under her eyes and "a large hematoma in the middle of her forehead." (*Id.* at 107:7-14). Schmitt believed, based on her training and observations, that Plaintiff had suffered a "severe head trauma." (*Id.* at 107:23-25). Schmitt and her partner immobilized Plaintiff (*id.* at 108:11-18; 113:19-114:4), and the ambulance transported Plaintiff to Niagara Falls Memorial Medical Center ("NFMMC"), arriving at 11:59 p.m. (*id.* at 116:21-23; *see also* Trial Exhibit 58).

Plaintiff's medical records from NFMMC indicate that she was treated for a head injury. (Trial Exhibit 58 at 8). On physical examination, her left knee was tender, she had a small abrasion in the area of the patella, she had a contusion on the left side of her forehead, and she had swelling and bruising around both eyes. (*Id.* at 9). Staff at NFMMC performed a CT scan of Plaintiff's head and facial bones, which revealed a moderate left frontal scalp hematoma, no intracranial hemorrhage or skull fracture, and no facial bone fracture. (*Id.* at 15). An x-ray of Plaintiff's left knee showed that it was intact. (*Id.* at 19). Plaintiff was assessed with a contusion to her head, face, and left knee and was discharged with a prescription for Tylenol with Codeine and instructions to ice locally and follow up as needed. (*Id.* at 16).

Plaintiff returned to New York City by bus on July 22, 2004. (Dkt. 211 at 75:8-11).  By 9:00 p.m. on July 22, 2004, Plaintiff had retained and was represented by Stanley J. Legan, Esq. (hereinafter "Legan") of the Ross Legan Law Firm ("Ross Legan").  (*See* Trial Exhibit 82).  That same evening, Plaintiff's "good friend," a man whose last name is Liu, transported her to the emergency room of a hospital in Queens, New York.  (Dkt. 208 at 207:4-20).  CT scans of Plaintiff's brain taken at this hospital were unremarkable.  (Dkt. 215 at 12:23-24).

Legan referred Plaintiff to Douglas Monasebian, M.D. (hereinafter "Dr. Monasebian"), a plastic surgeon with special emphasis on the face and maxillofacial region, who testified at trial. (Dkt. 215 at 5:4-25).  Dr. Monasebian first saw Plaintiff on July 28, 2004, so that he could provide a report to her lawyers.  (*Id.* at 7:22-8:3).  Dr. Monasebian communicated with Plaintiff through a translator, Lan Tao Sun, whose qualifications Dr. Monasebian knew nothing about, and who worked for Ross Legan. (*Id.* at 9:7-18; 11:13-18).

Plaintiff complained to Dr. Monasebian of pain on the left side of her face near her left temporomandibular joint ("TMJ"), blurry vision, and difficulty seeing out of her right eye.  (*Id.* at 15:2-5; 20:8-16).  Dr. Monasebian observed that Plaintiff had a conjunctival hemorrhage around her right eye, which is a leakage of blood around the eye ball and eye lid.  (*Id.* at 26:19-22, 27:2-6).  Plaintiff had swelling in her left facial area and was unable to open her mouth more than 20 millimeters, less than half the normal amount.  (*Id.* at 19:2-4; 23:16-18, 26:13-17).  Dr. Monasebian also noted swelling around the forehead and abrasions on the forehead.  (*Id.* at 21:8-17).  Dr. Monasebian opined that Plaintiff's

- 19 -

injuries were the result of blunt force facial trauma and that her ocular injury was best managed by an ophthalmologist and her TMJ and dental injuries were best managed by a dentist. (*Id.* at 40:4-41:4). As of July 28, 2004, Dr. Monasebian's opinion was that Plaintiff was disabled due to crime-related injuries. (*Id.* at 105:4-16, 107:6-9, 108:7-9).

Dr. Monasebian saw Plaintiff for a follow up on September 24, 2004. (*Id.* at 55:9-18). She continued to complain of pain in her face (*id.*), but her bruises and contusions had resolved (*id.* at 100:14-18). Dr. Monasebian's bills were submitted to the Crime Victims Board. (*Id.* at 64:15-19).

The Court generally found Dr. Monasebian credible with regard to his observations of Plaintiff's injuries. The Court partially credits Dr. Monasebian's opinion that Plaintiff was disabled as of July 28, 2004, but notes that Dr. Monasebian did not opine as to how long that disability was expected to last and he expressly stated that, depending on the kind of work Plaintiff did, she might still have been able to perform it. (*See id.* at 143:5-12). The Court further notes that Dr. Monasebian last saw Plaintiff in March 2006 (more than a decade ago) and thus was not able to testify regarding her current medical condition. (*See id.* at 61:10-12).

Also on July 28, 2004, Plaintiff underwent an orthopedic examination by Walter Ploski, M.D. (hereinafter "Dr. Ploski"). Dr. Ploski, who did not testify at trial, assessed Plaintiff with cervical derangement, low back derangement, facial injuries, strain and sprain of both shoulders, strain and sprain in the right wrist, headaches, dizziness, tinnitus, contusion and abrasion of the left knee, and right thigh strain. (Trial Exhibit 345 at 2). Dr. Ploski prescribed physical therapy for Plaintiff. (*Id.* at 3). The Court credits

Dr. Ploski's evaluation to the extent it was based on his objective medical evaluation of Plaintiff, but does not credit those portions based on Plaintiff's subjective complaints.

On July 29, 2004, Plaintiff was seen by Rezaul Karim, M.D. (hereinafter "Dr. Karim"). Dr. Karim did not testify at trial, but his written evaluation of Plaintiff was admitted into evidence. (*See* Trial Exhibit 343). Dr. Karim noted that Plaintiff had multiple facial bruises including ecchymosed eyes and subconjunctival hemorrhage, TMJ sprain and dysfunction, cervical sprain and strain, right shoulder sprain and strain, lumbosacral sprain and strain, severe post-concussion syndrome, severe post-traumatic stress disorder, left knee sprain, and he "rule[d] out cervical radiculopathy and rule[d] out traumatic radial nerve injury on the right. . . ." (*Id*. at 5). Dr. Karim indicated that Plaintiff was unlikely to be able to travel to Buffalo the following Monday. (*Id*.). The Court credits Dr. Karim's evaluation to the extent it was based on his objective medical evaluation of Plaintiff. The Court does not credit those portions of Dr. Karim's evaluation that are based on Plaintiff's subjective reports and/or complaints – specifically, the Court does not credit Dr. Karim's opinion that Plaintiff was suffering from post-concussion syndrome or post-traumatic stress disorder ("PTSD").

On September 1, 2004, Iqbal S. Merchant, M.D. (hereinafter "Dr. Merchant"), conducted an electromyography study ("EMG"), which showed evidence consistent with right L4-L5, L5-S1 radiculopathy and left L4-L5 radiculopathy. (*See* Trial Exhibit 338). MRIs of Plaintiff's spine conducted on September 2, 2004, and September 9, 2004, respectively, showed: straightening of the cervical spine associated with reversal of lordotic curve compatible with muscular spasm; generalized bulge of the thecal sac at

C5-C6 level causing indentation of the anterior subarachnoid space, but no evidence of cord compression; and mild degree of bulging of the annulus fibrosis at L5-S1 causing pressure effect on the thecal sac. (*See* Trial Exhibits 222A, 222B).

The credible evidence of record establishes that Plaintiff was injured by Rhodes' attack. Specifically, the Court finds that Plaintiff has proven by a preponderance of the evidence that, as a direct consequence of Rhodes' attack, she suffered: facial injuries, including bruising and abrasions; swollen eyes; a concussion; a frontal scalp hematoma; a contusion to her left knee; damage to her teeth and jaw; subconjunctival eye hemorrhage; right shoulder sprain; left knee sprain; lumbar and cervical sprain; and lumbar and cervical radiculopathy.

Plaintiff has submitted evidence (*see* Trial Exhibit 155) and the Government does not dispute, that the Crime Victims Board expended $64,313.18[6] in emergency medical services and support for Plaintiff following the incident. The Court finds that Plaintiff has proven by a preponderance of the evidence that those expenditures were the result of Rhodes' attack.

B.    **Plaintiff's Claimed Permanent Psychological and Neuropsychological Injuries**

Plaintiff asks the Court to find that, as a result of the incident with Rhodes, she has suffered permanent psychological and neuropsychological damage, including chronic PTSD with anxiety, chronic major depressive disorder, prolonged post-concussive

---

[6]    This amount paid by the Crime Victims Board also includes $2,514.18 in lost earnings. (*See* Trial Exhibits 155 & 217). As noted at pages 55-56, *infra*, the Court has taken this into account in its award of lost wages.

syndrome, cognitive impairments, cognitive deficits, and a structural brain injury. For the reasons discussed below, the Court finds that Plaintiff has not proved by a preponderance of the evidence that she suffered permanent psychological or neuropsychological damage as a result of Rhodes' attack.

### 1. Plaintiff's health care providers did not confirm her pre-incident condition.

As discussed at length in section II, *supra*, the Court did not find Plaintiff to be a credible witness. However, the medical professionals who testified regarding her psychological and neuropsychological condition uniformly based their conclusions on Plaintiff's self-report of her ability to function prior to the incident with Rhodes. Dr. Chen, for example, confirmed that he had never seen any medical or psychiatric records for Plaintiff prior to July 2004, nor had he spoken to her family regarding her pre-incident condition, and that he had simply relied on Plaintiff's statement that she had never previously suffered from any psychiatric illnesses. (Dkt. 219 at 242:3-17). Similarly, Dr. Stein stated that his assessment of Plaintiff's pre-incident functioning was "based on her history of graduating high school with an A average, . . . graduating Teacher's University in China, [and] developing her own company. . . ," but he never saw her education or work records, did not speak to any of her family members or work colleagues, and did not obtain any of her past medical records from China. (Dkt. 218 at 101:7-13; 206:22-207:23). Notably, Dr. Stein's 2004 report regarding Plaintiff does not address whether she had any preexisting emotional conditions. (*Id.* at 224:13-15). Hal Gutstein, M.D. (hereinafter "Dr. Gutstein"), a neurologist who examined Plaintiff and testified on her

behalf, also explained that his assessment of Plaintiff was based on his interview of her and confirmed that he had never seen any medical, educational, or work records for Plaintiff for the period prior to July 2004. (Dkt. 217 at 11:15-24, 105:12-18, 106:10-12).

The Court's credibility finding regarding Plaintiff thus necessarily impacts its assessment of Drs. Chen, Stein, and Gutstein. Irrespective of their individual credibility and any issues with respect to their testing of Plaintiff (all of which are discussed below), their opinions are inherently of limited value because they rely on the assumption that Plaintiff's recounting of her pre-incident functioning is an appropriate baseline from which to measure. In short, even were the Court to fully credit Drs. Chen, Stein, and Gutstein regarding Plaintiff's current condition (which, to be clear, it does not do, for the reasons discussed below), Plaintiff's proof would still fall short because none of these doctors can credibly opine on how Plaintiff's present condition differs from her condition prior to the incident.

The Court also notes that the psychological and neuropsychological diagnoses reached by Drs. Chen, Stein, and Gutstein were based on Plaintiff's subjective complaints, such as claims of ongoing pain, emotional distress, insomnia, and nightmares. Dr. Chen testified that the practice of clinical psychiatry is "based mainly on the patient's subjective complaint[s]" (Dkt. 219 at 181:12-19), and that his assessment of Plaintiff's occupational and social impairments was based upon her self-report to him (*id.* at 330:16-21). Dr. Stein testified that he discounted Dr. Merchant's findings based upon information from Plaintiff (Dkt. 218 at 221:5-8), and that he did not even consider whether Plaintiff had a preexisting emotional disorder that might have skewed her test

- 24 -

results (*id.* at 239:3-5). Dr. Gutstein testified that his findings would be undermined if Plaintiff was not credible. (Dkt. 217 at 161:17-162:2). Because the Court does not consider Plaintiff's subjective complaints credible, any diagnoses based on these subjective complaints are likewise not credible. *See, e.g., Williams v. United States*, 597 F. App'x 647, 649 (2d Cir. 2015) (determining that the district court did not err in disregarding testimony of medical experts "who relied for their ultimate diagnostic conclusions, directly or indirectly, on plaintiff's subjective reports," where the plaintiff was not credible).

### 2. The Court did not find Dr. Chen credible.

Dr. Chen was first contacted by Ross Legan in July 2004 and asked to evaluate Plaintiff. (Dkt. 219 at 4:19-5:3). Dr. Chen continued to treat Plaintiff (albeit on and off) for the following 11 years. (*Id.* at 3:23-4:4). On the whole, the Court did not find Dr. Chen's testimony credible. His tone, demeanor, and certain portions of his testimony strongly indicated to the Court that his opinions were derived not from his training, experience, and expertise, but from his personal regard for Plaintiff, including his sympathy for her situation. While the Court's impression of Dr. Chen's credibility was not based solely on these factors, the Court notes that the following played a role in its assessment: (1) Dr. Chen testified that he wrote his initial report for free because he felt sympathetic for Plaintiff; (2) Dr. Chen testified that he charged Plaintiff less than his standard rate because he was "very sympathetic with her condition"; (3) Dr. Chen stated that he respected Plaintiff and that she "must have [had] a reason" for not accurately reporting her marital status to him; and (4) in February 2009, Dr. Chen wrote a letter on

Plaintiff's behalf to help her obtain a visa in which he reported that she had suffered a "relapse" based solely on her self-report. (Dkt. 219 at 169:20-171:18, 238:5-10; 373:2-8; 433:3-21). Overall, the Court was left with the definite impression that Dr. Chen simply accepted without question everything Plaintiff reported to him and that his resulting sympathy colored his medical objectivity.

The Court was also troubled by inconsistencies in Dr. Chen's testimony. In particular, in response to a direct question from this Court, Dr. Chen stated unequivocally, twice, that he did not know that Ross Legan had called a press conference in July 2004 and that he had not spoken to Plaintiff about how the incident was exposed to the media in the first instance. (*Id.* at 435:19-436:8). However, on re-cross examination, Dr. Chen admitted that he was in fact aware of the press conference and that Plaintiff had told him about it. (*Id.* at 445:13-446:21). Dr. Chen also testified (again, in response to a direct question from the Court) that he had not diagnosed Plaintiff with a brain injury (*id.* at 92:23-93:2), but then, seemingly after consulting with counsel during a break, he changed his testimony and asserted that Plaintiff did indeed have an underlying brain injury (*id.* at 100:24-101:16). At best, Dr. Chen's inconsistencies in this regard suggest to the Court a lack of rigor with respect to his analysis of this case.

The Court also did not find Dr. Chen's testimony credible because he conceded that his initial diagnoses of major depressive disorder, single episode, and PTSD were premature, yet offered no compelling explanation for having reached his conclusions prematurely. (*Id.* at 67:19-68:19, 78:18-79:2). The Court was troubled by Dr. Chen's assertion that the diagnostic criteria set forth in the Diagnostic and Statistical Manual of

Mental Disorders were "arbitrary" (*see id.* at 68:17-19), and that he was therefore correct to ignore them where Plaintiff did not meet the durational requirements. Again, the Court observed that Dr. Chen did not appear to have approached Plaintiff's medical symptoms objectively.

Because the Court did not find Dr. Chen credible, and for the other reasons discussed above, it does not credit his opinions regarding Plaintiff's psychological and neuropsychological condition and the treatment she will allegedly require in the future.

### 3. The Court did not find Dr. Stein credible.

Dr. Stein was retained by Ross Legan in August 2004 to examine Plaintiff. (Dkt. 218 at 17-25). Dr. Stein performed neuropsychological testing on Plaintiff on four different occasions. (*See* Plaintiff's Trial Exhibit 218). The Court did not find Dr. Stein to be a credible witness. Throughout his testimony, Dr. Stein was evasive, refused to answer the question asked, and offered unsolicited commentary. His tone, demeanor, glibness, and unwillingness to answer direct, straightforward questions without Court intervention were not supportive of credibility. The Court's observations of Dr. Stein played a significant role in its assessment of his credibility.

The Court was also troubled by Dr. Stein's use of translators with unknown credentials to interact with Plaintiff. Dr. Stein testified that his 2004 examination of Plaintiff was conducted in Mandarin (Dkt. 218 at 203:15-19), and that Eric Poon (hereinafter "Poon"), the nephew of one of Ross Legan's attorneys, served as translator (*id.* at 194:23-198:13). Dr. Stein was not able to provide any information regarding Poon's qualifications as a translator. Incredibly, he claimed that he was personally

capable of determining whether Poon was a qualified Mandarin translator despite having no proficiency in the language himself. (*Id.* at 204:2-11). In 2008, Dr. Stein used Lan Tao Sun (hereinafter "Sun"), an employee of Ross Legan, as translator. (*Id.* at 299:20-301:9). As with Poon, it does not appear that Dr. Stein made any independent effort to verify Sun's capability as a translator. Sun also served as translator when Dr. Stein saw Plaintiff in 2014. (*Id.* at 339:11-19). Dr. Stein's use of translators who were associated with Plaintiff's law firm (and therefore not neutral parties) and whose qualifications he seemingly made no effort to verify caused the Court to conclude that he did not approach this case in a methodologically sound manner. Moreover, there is reason to question whether these individuals were, in fact, qualified to serve as translators. Notably, in 2014, Sun recorded Plaintiff's profession as a "freelance musician" when this was not in fact the case. (*See id.* at 348:17-349:2). Sun's apparent error in recording Plaintiff's profession suggests at least the possibility that he was not able to fully understand her. Dr. Stein's failure to takes steps to ensure that the translation process was performed accurately and appropriately calls into question the validity of all the tests he conducted on Plaintiff.

The Court also found Dr. Stein's testing methodology sloppy, at best. The following examples of this sloppiness are illustrative and not exhaustive. As a threshold matter, Dr. Stein did not perform all the testing on Plaintiff himself, but had his wife, who is not a physician, perform some of the testing. (*Id.* at 22:19-24:3). Dr. Stein's explanation for why his wife performed some of the testing was convoluted and not compelling. (*See id.* at 23:6-25:5). Turning to the specifics of the testing, Dr. Stein

testified that in 2004, he assessed Plaintiff using the Beck Depression Index. (*Id.* at 291:19-293:3). Despite the fact that the instructions for this test provided that the patient should choose only one response for each question, Dr. Stein told her to choose as many as applied. (*Id.* at 292:4-11). Also in 2004, Dr. Stein's wife performed the Wechsler Adult Intelligence Scale ("WAIS") test, a general test of intelligence, on Plaintiff. (*Id.* at 25:12-20). The WAIS test includes a discrepancy analysis page, yet this page was not completed with respect to Plaintiff. (*Id.* at 268:12-16, 269:4-7). Moreover, despite the fact that a Mandarin version of the WAIS became available in the time period Dr. Stein evaluated Plaintiff, he never tested her using the Mandarin WAIS, even though that test would have contained information more appropriate for someone born and raised in China. (*Id.* at 246:20-247:2, 258:16-21). In fact, Dr. Stein did not testify that any of the tests he used to assess Plaintiff had been validated as appropriate for native speakers of Mandarin.

As with Dr. Chen, because the Court did not find Dr. Stein credible, and for the other reasons previously discussed, it has not credited his opinions with regards to Plaintiff's psychological and neuropsychological condition, nor does it credit the results of his testing.

The Court notes that Plaintiff has argued that the Court should draw a negative inference from the Government's failure to call neuropsychologist Dr. Ralph Benedict (hereinafter "Dr. Benedict") as a witness. (*See* Dkt. 234 at 71-73). Specifically, Plaintiff argues that Dr. Benedict was given the raw data underlying Dr. Stein's testing of Plaintiff and that the Court should infer from the Government's failure to call Dr. Benedict as a

witness that Dr. Stein's utilization of translators did not violate any standards of the American Psychological Association ("APA"). (*Id.*). The Government responds that Dr. Benedict only became involved in the instant matter because Dr. Stein refused to release his testing results directly to the U.S. Attorney's Office, and that Dr. Benedict never examined Plaintiff, produced an expert report, or was identified as an expert in this matter. (Dkt. 236 at 7-8). The Government further argues that it has never contended that Dr. Stein violated any APA standards. (*Id.* at 8).

A missing witness inference may be appropriate where a party fails to call a witness who is "peculiarly within [that party's] control." *See United States v. Slaughter*, 386 F.3d 401, 403 (2d Cir. 2004). However, the allegedly missing witness's testimony must have been material to the issues at trial. *United States v. Donald*, 417 F. App'x 41, 44 (2d Cir. 2011). A missing witness instruction is permissive, and merely allows the jury to draw an adverse inference against a party, as opposed to requiring that such an inference be drawn. *See id.* Here, the Court sees no reason to conclude that Dr. Benedict would have had information material to this case. It is clear that his role was as a conduit for information, and not as an examining expert. Moreover, the Court has not concluded that Dr. Stein violated APA standards in his testing of Plaintiff, nor has it based its Findings of Fact on any such conclusion. Accordingly, the negative inference suggested by Plaintiff is unnecessary in any event. The Court denies Plaintiff's request that it draw a negative inference from the Government's failure to call Dr. Benedict.

### 4. The Court found Dr. Gutstein partially credible.

With respect to Dr. Gutstein, the Court found him to be more credible than Drs. Chen and Stein, but not fully credible. Specifically, and as discussed more fully in section C, *infra*, the Court found Dr. Gutstein credible with respect to Plaintiff's claimed neck/back injuries, but did not find his assessment of Plaintiff's psychological and neuropsychological condition credible.

Dr. Gutstein is a neurologist who first saw Plaintiff in September 2011. (Dkt. 217 at 4:11-13, 6:5-10). He conducted two additional examinations in February 2014 and March 2015. (*Id.* at 6:11-15). Dr. Gutstein opined that, among other maladies, Plaintiff suffered from severe post-concussive syndrome, cognitive deficits, cognitive difficulties, severe PTSD with anxiety, severe depression, "emotion liability," insomnia, and nightmares as a result of Rhodes' attack. (*Id.* at 6:22-7:15).

Like Dr. Stein, Dr. Gutstein used Ross Legan's employee Sun as a translator for his interactions with Plaintiff. (*Id.* at 107:9-108:13). Dr. Gutstein acknowledged that he played no role in arranging for the translator and that he was aware that Sun was connected to Plaintiff's law firm. (*Id.* at 107:23-25, 108:8-13). Dr. Gutstein's failure to ensure that the translator was qualified and unbiased calls into question the reliability of his assessment of Plaintiff, particularly where it was based on her subjective complaints.

The Court also found Dr. Gutstein's tone and demeanor while testifying about Plaintiff's alleged psychological and neuropsychological conditions less than credible. His testimony was far less clear and confident than it was with respect to Plaintiff's spinal injuries, which are discussed below. Indeed, Dr. Gutstein acknowledged during

his testimony that he does not treat complex psychiatric issues. (*Id.* at 109:6-13). He further acknowledged that his assessment of Plaintiff assumed that Dr. Stein's neuropsychological testing of Plaintiff was valid, and that his findings would be undermined if Plaintiff was not credible and the neuropsychological testing performed by Dr. Stein was unreliable. (*Id.* at 159:2-4, 161:17-162:2). In other words, Dr. Gutstein's opinions regarding Plaintiff's psychological and neuropsychological condition rise or fall with the reliability of Plaintiff and Dr. Stein, both of whom the Court found not credible and unreliable. Accordingly, the Court did not find Dr. Gutstein's testimony regarding Plaintiff's alleged psychological and neuropsychological conditions credible or persuasive, and it has not credited this testimony in making its Findings of Fact.

For the foregoing reasons, the Court finds that Plaintiff has failed to meet her burden of proving that she has suffered ongoing psychological and neuropsychological damage as a result of Rhodes' attack. Specifically, the Court finds that Plaintiff has not proven by a preponderance of the evidence that, as a result of Rhodes' attack, she suffers from chronic PTSD (with or without anxiety), chronic major depressive disorder, chronic post-concussive syndrome, cognitive deficits, cognitive impairments, "emotion liability," a structural brain injury, or chronic tinnitus.

### C. Plaintiff's Claimed Permanent Back Injuries

Plaintiff presented evidence that she suffers from permanent back injuries as a result of Rhodes' attack. In particular, Dr. Gutstein opined that Plaintiff suffered from "cervical radiculopathy of the C5-C6 disc bulge; lumbar radiculopathy L5-S1 due to bulging; annulus fibrosis at L5-S1 causing pressure effect on the thecal sac with the right

L4-5 and L5-S1 nerve root injury, and left L4-5 nerve root injury. . . ." (Dkt. 217 at 7:11-15).  Dr. Gutstein opined that these injuries were permanent.  (*Id.* at 31:7-17, 88:2-7).

The Government contends that the back injuries Plaintiff sustained in the incident have fully resolved.  Specifically, Daniel Castellani, M.D. (hereinafter "Dr. Castellani"), a neurologist retained by the Government to examine Plaintiff (*see* Dkt. 210 at 4:18-19), testified that Plaintiff sustained a cervical strain and a lumbosacral strain as a result of Rhodes' attack (*id.* at 52:15-18), but that these sprains and strains should have resolved in a matter of weeks and were demonstrably resolved by October 2005 (*id.* at 53:9-17; 54:5-11).

The Court found Dr. Gutstein's interpretation of the objective medical evidence related to Plaintiff's back injuries more persuasive than Dr. Castellani's interpretation.  Dr. Castellani acknowledged that Plaintiff had a lumbar disc bulge, but contended that it was age related.  (*Id.* at 40:14-41:10).  However, Dr. Gutstein explained that if the disc bulge was indeed the result of a degenerative condition, one would expect to see "widespread changes of the bones and the discs and the joint which reflect aging over time. . . ." (Dkt. 217 at 84:3-16).  Plaintiff did not exhibit diffuse changes of the spine; rather, one disc was damaged in the lumbar spine and one disc was damaged in the cervical spine, which indicated that the damage was "traumatically induced." (*Id.*).  Dr. Gutstein also explained that his physical examination of Plaintiff revealed mild weakness of the left anterior tibialis muscle, slightly diminished left ankle reflex, and muscle spasms bilaterally in the mid to lower lumbar spine, all of which were consistent with the injuries he had diagnosed.  (*Id.* at 23:23-24:13).  The Court found Dr. Gutstein's analysis

and explanation of the imaging of Plaintiff's spine and his physical examination credible, and credits his opinion that the damage to Plaintiff's spine was caused traumatically by the incident with Rhodes. The Court notes that its conclusion is based, in part, on the fact that Dr. Gutstein was able to confirm his diagnosis through objective evidence, separate and apart from Plaintiff's self-report denying any age-related back problems.

The Court also did not find Dr. Castellani's conclusion that Plaintiff did not suffer from radiculopathy persuasive. The record is replete with evidence that Plaintiff suffered from radiculopathy, including the EMG studies conducted in 2004 by Dr. Merchant, records from Dr. Ploski's office (*see* Trial Exhibit 345), and an assessment performed by Joseph Sciortino, M.D. (hereinafter "Dr. Sciortino"), in 2006 (*see* Trial Exhibit 347). Moreover, Dr. Castellani's own examination of Plaintiff revealed diminished sensation in the right C6 dermatome and the right L4 through S1 dermatomes, and a Tinel sign over the right median nerve. (Dkt. 210 at 32:3-11, 34:9-22). Dr. Gutstein testified that diminished sensation in the L4 to S1 dermatomes was consistent with Dr. Sciortino's findings of cervical and lumbar radiculopathy. (Dkt. 217 at 191:17-192:16).

For the reasons discussed above, the Court finds that Plaintiff suffered permanent injuries to her back as a result of Rhodes' attack. However, the Court does not find that Plaintiff has established a need for ongoing medical treatment related to those injuries.

Dr. Gutstein testified that Plaintiff's back injuries would cause symptoms of variable severity. (*Id.* at 176:2-6). He further testified that medication and physical therapy for these types of injuries are "self-limiting" and that individuals "just learn to live with it" and "power through it." (*Id.* at 90:7-91:21). Dr. Gutstein did testify that

Plaintiff should be seen by a neurologist once a year to look for signs of deterioration. (*Id.* at 92:22-25). However, Dr. Gutstein had not previously recommended to Plaintiff that she be treated by a neurologist, and there is no evidence that she has ever had such treatment. (*Id.* at 174:5-18). Accordingly, the Court does not credit Dr. Gutstein's testimony that Plaintiff needs to see a neurologist once a year. Dr. Gutstein also testified that Paxil and Klonipin could be useful in treating Plaintiff's back pain (*id.* at 90:23-91:3), but the Court found his testimony to be speculative in this regard. There is no evidence in the record that these drugs were ever prescribed to Plaintiff for such a purpose (to the contrary, Dr. Chen testified that Paxil had been prescribed to Plaintiff for depression and that Klonipin had been prescribed for anxiety, (*see* Dkt. 219 at 80:15-17)), and Dr. Gutstein did not testify regarding the expected efficacy of these drugs for pain relief, giving only a general indication that they could potentially help with Plaintiff's back pain (Dkt. 217 at 90:23-91:3).

## D.   Plaintiff's Claimed Gastrointestinal Injuries

In her proposed findings of fact, Plaintiff urges the Court to conclude that she suffers from chronic severe constipation as a result of the incident with Rhodes. (*See* Dkt. 222 at ¶¶ 282-85). However, the sole evidence identified by Plaintiff in support of this claim is her testimony that she never suffered from gastrointestinal symptoms prior to the incident but is now unable to move her bowels without the aid of medication, and Dr. Chen's testimony that her stomach pain and constipation are the result of damage to her mental state. (*See id.*). As discussed at length above, the Court did not find either Plaintiff or Dr. Chen to be credible witnesses, and accordingly does not find that Plaintiff

- 35 -

has shown by a preponderance of the evidence that Rhodes' attack caused her to suffer from chronic constipation or other chronic gastrointestinal issues. The Court notes that there is no corroborating evidence for Plaintiff's claim that she was free from gastrointestinal issues prior to the incident, nor is there any objective confirmation of her subjective complaints.

## VII. Plaintiff's Claimed Business Losses

In addition to her medical injuries and expenses, Plaintiff is seeking compensation for the loss of past and future earnings and for the loss of her interest in TZLC. Plaintiff claims that she was unable to continue managing TZLC after Rhodes' attack because of her "psychiatric limitations" (Dkt. 222 at ¶ 289), and that she similarly was forced to sell TZLC for an amount significantly below its market value (*id.* at ¶¶ 338-345).

### A. Lost Earnings

Plaintiff claims that she was completely unable to work from July 21, 2004, to December 2009, and that thereafter she was able only to work part-time and in a diminished capacity. The Court finds that Plaintiff has failed to bear her burden of proving that she was disabled from working as a result of Rhodes' attack beyond October 2004. Accordingly, the Court finds that Plaintiff has failed to establish the vast majority of her claim for lost earnings.

The Court finds that there is corroborating evidence for Plaintiff's claim that she was unable to work in the immediate aftermath of the incident. On July 28, 2004, one week after the incident, Dr. Monasebian's opinion was that Plaintiff was disabled, though he conceded that, depending on the nature of Plaintiff's work, she might have been able

to perform it. (Dkt. 215 at 105:4-16, 107:6-9, 108:7-9, 143:5-12). Similarly, on July 29, 2004, Dr. Karim opined that Plaintiff's injuries were sufficiently severe that she could not travel from New York City to Buffalo. (*See* Trial Exhibit 343). Dr. Castellani, the Government's expert, opined that Plaintiff's concussion and strains would have rendered her disabled for three months. (Dkt. 210 at 55:6-14). Dr. Gutstein also testified that most people recover from concussions in approximately three months. (Dkt. 217 at 163:22-24). The Court finds that Plaintiff has proven by a preponderance of the evidence that she was unable to work for three months following the incident.

However, the Court does not find that Plaintiff has demonstrated that her period of disability extended beyond October 2004. The Court acknowledges that there is evidence that Plaintiff was hospitalized in China for a period of time in late 2004 and early 2005 (*see, e.g.*, Dkt. 219 at 108:5-14; Trial Exhibit 217). However, it appears that Plaintiff's hospitalization was based primarily on her subjective complaints about anxiety, depression, and fearfulness (*see* Dkt. 219 at 110:2-6), which is confirmed by the fact that she was hospitalized in the Mental Hygiene Department of the hospital (*see* Trial Exhibit 217). Additionally, none of Plaintiff's physicians from China appeared at trial to explain how the decision to hospitalize her was made. The Court is unable to conclude that Plaintiff's hospitalization in China was a result of her objective medical injuries rather than her subjective complaints regarding her psychological condition, and therefore it does not consider the hospitalization evidence that Plaintiff was unable to work during that time period as a result of the incident with Rhodes. Moreover, and for all the reasons discussed at length above, the Court does not credit Plaintiff's testimony that she was

unable to work during that time, nor does it find Drs. Chen, Stein, and Gutstein's opinions in this regard credible.

There is also no evidence that Plaintiff's permanent back injuries have rendered her unable to work. To the contrary, Plaintiff is currently employed, albeit part-time, and is generally able to ride a bicycle four miles round-trip to work. (Dkt. 209 at 55:16-21, 72:18-22, 100:2-24). Plaintiff herself claims that it was her "anxiety, difficulty interacting with people, and cognitive difficulties" that prevented her from returning to TZLC (Dkt. 222 at ¶ 292), and not any physical difficulties with performance.

For the reasons discussed above, the Court finds that Plaintiff has proven by a preponderance of the evidence that she was unable to work for three months following the incident, but that she has otherwise failed to meet her burden of proof to show that her injuries prevented her from working.

With regard to her earnings at the time of the incident, Plaintiff has produced three months of payroll records from a company called Tianjin Zhaomiao Tech-Trade Co., Ltd., which she maintains is the same company as TZLC. (*See* Trial Exhibit 150). These payroll records show monthly wages of ¥ 12,000 for Plaintiff in April, May, and June of 2004. (*Id.*). The Government has challenged the authenticity of these payroll records. (*See, e.g.*, Dkt. 221 at 44). However, at trial, the Government was given the opportunity to question Plaintiff regarding these records and ultimately did not object to their admission into evidence. (*See* Dkt. 208 at 164:10-165:25). Moreover, in its pre-trial motion in limine, the Government argued that Plaintiff's payroll records were not sufficient evidence of her claimed lost earnings (*see* Dkt. 136 at 6-8), but made no

challenge to the authenticity of the documents. The Court rejects the Government's belated objection to the authenticity of these documents, and, as discussed further in its Conclusions of Law, accepts them as evidence of Plaintiff's wages during the relevant time period.

**B.    Loss of Value of TZLC**

In addition to seeking lost earnings, Plaintiff seeks $6,800,000 for the alleged loss of her interest in TZLC. (*See* Dkt. 222 at ¶ 344). The Court finds that Plaintiff has not proven this loss by a preponderance of the evidence. As with the bulk of Plaintiff's claim for lost earnings, Plaintiff's claim for the loss of her interest in TZLC is based on her self-report that she was so psychologically damaged by the incident that she was "unable to take care" of the company and that "[h]er depression and PTSD symptoms prevented her from executing her business duties, and her cognitive ability to concentrate prohibited her from functioning at the level necessary to run the business." (*Id.*at ¶ 338). The Court does not find Plaintiff's claims credible. The Court has already found that Plaintiff failed to prove by a preponderance of the evidence that the incident caused depression, PTSD, or cognitive disability. As a result, the Court finds no reason to conclude that Plaintiff was rendered unable to manage TZLC as a result of the incident, and therefore it gives no credit to her assertion that she was forced to sell her interest therein.

## CONCLUSIONS OF LAW

I. **Application of the FTCA**

"The FTCA is a limited waiver of the sovereign immunity of the United States. This Act provides for lawsuits against the United States for injuries caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment. . . ." *O'Neill v. United States*, 927 F. Supp. 599, 603 (E.D.N.Y. 1996) (internal quotation omitted). The FTCA specifically waives the United States' sovereign immunity for claims against "[federal] investigative or law enforcement officers" for "assault, battery, false imprisonment, false arrest, malicious prosecution, [and] abuse of process." 28 U.S.C. § 2680(h). Here, the Government has not disputed, nor could it reasonably dispute, that Rhodes was acting within the scope of his employment during his interactions with Plaintiff. *See, e.g.*, *Asto v. Mirandona*, 372 F. Supp. 2d 702, 707 (E.D.N.Y. 2005) (stating that under New York law, an employee acts within scope of employment while "doing his master's work, no matter how irregularly, or with what disregard of instructions" (internal quotation omitted)).

Under the FTCA, liability is to be determined based on the law of the place where the act or omission occurred—in other words, New York law applies in this case. *See Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) ("[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees.").

## II.  Motions in Limine

Prior to the bench trial of this matter, the parties filed several motions in limine, of which the following portions remain unresolved: (1) Defendant's motion in limine related to non-economic loss issues, to the extent that it sought to exclude certain of Rhodes' personnel records and evidence of the ROI/Redbook generated by the Department of Homeland Security, Office of Professional Responsibility (Dkt. 131); (2) Defendant's motion in limine related to economic loss issues, to the extent that it sought to preclude Plaintiff from seeking economic damages and to exclude the testimony of Plaintiff's accounting expert, William A. Hanlin (Dkt. 134); and (3) Plaintiff's motion in limine, to the extent that it sought to preclude evidence that Plaintiff failed to comply with commands given by Rhodes (Dkt. 137).  The remaining issues raised by the motions in limine were resolved by the Court either prior to or during the course of the trial.

### A.  Admissibility of the ROI/Redbook

In a pretrial motion, the Government argued that the ROI/Redbook should not be admitted into evidence for various reasons.  (*See* Dkt. 133 at 21-25).  However, at trial, the Government made no objection when Plaintiff moved to admit the ROI/Redbook into evidence.  (*See* Dkt. 211 at 54:6-55:4).  Moreover, the Court has not relied on the ROI/Redbook in reaching any of its conclusions in this matter.  As discussed elsewhere in this Decision and Order, the Court found the testimony at trial sufficient to establish that Rhodes used excessive force on Plaintiff, without reference to any of the statements contained in the ROI/Redbook.  The Government's request to exclude the ROI/Redbook is denied as moot.

### B.    Admissibility of Rhodes' Personnel Records and Disciplinary History

Defendant also moved prior to trial that Plaintiff be prohibited from introducing evidence related to Rhodes' personnel records and various prior disciplinary actions. (*See* Dkt. 133 at 16-21). Plaintiff's counsel did question Rhodes to some extent regarding these prior incidents. (*See, e.g.*, Dkt. 207 at 81:19-83:22). However, the Court did not find the information regarding Rhodes' personnel records or disciplinary history relevant to its conclusions in this matter, and therefore it has not relied on that information. In other words, the Court did not find Rhodes credible and has not credited his version of events—therefore, any information about his record that sheds further light on that credibility assessment is not dispositive to the Court's determination. Accordingly, Defendant's request to preclude this evidence is denied as moot.

### C.    Defendant's Request to Preclude Hanlin's Testimony and to Prevent Plaintiff from Seeking Economic Damages

In its motion in limine related to economic loss, Defendant requested that: (1) the Court preclude Plaintiff from seeking economic damages related to her claimed lost wages and loss of her interest in TZLC; and (2) the Court preclude the testimony of Plaintiff's accounting expert, Hanlin. (*See* Dkt. 136).

With respect to Plaintiff's claimed business losses, the Court has found that Plaintiff has established only that she was unable to work for three months following the incident, and that she has otherwise failed to prove that her earnings or business interests were damaged by Rhodes' attack. Based on these factual findings, the Court did not find Hanlin's testimony relevant or persuasive and has not considered or relied upon it in

reaching its conclusions. Accordingly, the sole issue the Court needs to decide is whether Plaintiff should be permitted to claim lost earnings for the three month period she was disabled. The remainder of the Government's motion is denied as moot.

The Government argues that Plaintiff's lost wage claim does not satisfy New York's requirement that economic losses be proved with reasonable certainty. In particular, the Government argues that Plaintiff seeks lost past wages without sufficient corroborating evidence.

"Under New York law, an award for loss of income must be established to a reasonable certainty given the plaintiff's earning capacity both before and after the accident giving rise to the suit. . . . Such an award cannot be based on mere conjecture alone." *Carroll v. United States*, 295 F. App'x 382, 385 (2d Cir. 2008). "Unsubstantiated testimony, without documentation, is insufficient to establish lost earnings." *Lodato v. Greyhawk N. Am., LLC*, 39 A.D.3d 494, 496 (2d Dep't 2007); *see Mastrantuono v. United States*, 163 F. Supp. 2d 244, 258 (S.D.N.Y. 2001) (finding that the plaintiff's estimation of annual earnings by averaging 1995 to 1997 income without W-2 forms for the years 1998, 1999, and 2000 was insufficient to support lost wages claim); *McAdams v. United States*, No. 04 CIV. 6541(FM), 2006 WL 1738028, at *8 (S.D.N.Y. June 22, 2006) ("Under New York law, a claim for lost wages which is wholly unsupported by documentary evidence is insufficiently detailed or certain to warrant an award for past lost wages."); *Thomas v. 14 Rollins St. Realty Corp.*, 25 A.D.3d 317, 318 (1st Dep't 2006) ("Plaintiff's claim for past lost wages was properly dismissed at the close of his case for lack of evidence establishing an earnings history." (citation

omitted)). However, payroll records may be used as evidence of lost wages. *See Terranova v. New York City Transit Auth.*, 806 N.Y.S.2d 449, 2005 WL 2219685, at *4 (Sup. Ct. Aug. 23, 2005) ("[T]he jury's awards for lost earnings were supported by solid payroll records. . . ."). The payroll records must be properly admitted into evidence as business records. *See Lodato*, 39 A.D.3d at 495-96 (lost wages not appropriate where "plaintiff offered no tax returns, W-2 forms, or pay stubs" into evidence, but only provided payroll records that were inadmissible as documents made in the regular course of business because the witness used to introduce them into evidence was not qualified to give testimony as to record-keeping practices).

Here, the payroll records in question were entered into evidence as business records at the time of trial, with no objection by the Government. The payroll records showed Plaintiff's earnings for the three months directly preceding the incident, which the Court finds is sufficient to allow it to conclude with reasonable certainty that Plaintiff's earnings for the three months following the incident would have been comparable. The Court therefore denies Defendant's motion to the extent it asks that Plaintiff be precluded from seeking past lost earnings for the three months directly following the incident.

### D.    Evidence that Plaintiff Did Not Comply with Rhodes' Commands

In her pre-trial motion in limine, Plaintiff asked the Court to preclude the Government from offering evidence that Plaintiff failed to abide by lawful commands from the Government's officers. (*See* Dkt. 137-2 at 5-6). To the extent any such

evidence was presented at trial, it was not credited or relied upon by the Court in reaching its conclusions in this matter. Plaintiff's request is denied as moot.

In summary, the Court resolves the still-pending issues in the parties' motions in limine as follows: (1) Defendant's request that Plaintiff be prohibited from seeking past lost wages for the three months directly following the July 21, 2004 incident is denied; and (2) all other outstanding requests are denied as moot or were otherwise resolved at trial.

## III. Plaintiff's Claims

### A. Mutual Exclusivity of Assault/Battery Claims and Negligence Claims

Plaintiff's Amended Complaint, while not a model of clarity, asserts causes of action sounding in negligence, assault and battery,[7] and false arrest. (Dkt. 10).[8] As a threshold matter, the Government argues that Plaintiff cannot recover for both intentional torts (*i.e.* assault or battery) and negligence. (Dkt. 221 at 15). In response, Plaintiff contends that this is a case of "'negligent assault' based upon mistaken association" and

---

[7]     As the Government points out, Plaintiff did not plead a cause of action sounding in battery (Dkt. 221 at 14), but rather characterized her second cause of action as alleging an assault (Dkt. 10 at 2). However, as the Government appears to concede (*see* Dkt. 221 at 14), the actual factual allegations contained in the second cause of action allege a battery, although the claim is couched solely in terms of an assault (Dkt. 10 at 2 (claiming "government officers, agents and/or employees . . . unlawfully laid hands upon the plaintiff. . . .")). Accordingly, the Court interprets Plaintiff's second cause of action as alleging an assault and battery.

[8]     As noted by Judge Skretny in his Decision and Order entered on June 14, 2013, although the claims were not so specifically styled in the Amended Complaint, the Court construed the allegations as asserting claims for assault, false arrest, and excessive force in the interests of efficiency. (Dkt. 112 at 14 n.6).

that "a verdict for both causes of action [is] supported by the applicable law and the facts at bar." (Dkt. 229 at 60).

New York law is clear that a plaintiff cannot prevail on both a claim for assault and a claim for negligence. *See Rafferty v. Arnot Ogden Mem'l Hosp.*, 140 A.D.2d 911, 911 (3d Dep't 1988) ("[O]nce intentional offensive contact has been established, the actor is liable for assault and not negligence. There is, properly speaking, no such thing as a negligent assault." (internal citations and quotations omitted)); *see also Wood v. Strong Mem'l Hosp. of Univ. of Rochester*, 262 A.D.2d 1054, 1054 (4th Dep't 1999) (dismissing claims that alleged "negligent commission of intentional torts" because "[i]ntentional torts require proof of intent, not mere negligence"); *cf. United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2d Cir. 1993) ("Analysis begins with a recognition of the mutual exclusivity of negligence and battery. There is no such cause of action as negligent assault and battery. An assault and battery is an intentional act, whereas negligence is unintentional." (internal quotation omitted)). While Plaintiff is correct that she was permitted to plead these theories in the alternative, "there cannot be a verdict in [the] plaintiff's favor upon both negligence and assault theories. . . ." *Rafferty,* 140 A.D.2d at 912. Accordingly, because the Court finds, for the reasons set forth below, that Plaintiff has proven that Rhodes committed a battery against her, the Court dismisses Plaintiff's negligence claim.

**B.    Plaintiff's Assault and Battery Claim**

Under New York law, an assault is the intentional placing of another person in apprehension of imminent harmful or offensive conduct. *Girden v. Sandals Int'l*, 262

- 46 -

F.3d 195, 203 (2d Cir. 2001). Battery occurs when a person intentionally touches another person without the person's consent and causes an offensive bodily contact. *Id.* "[T]he test for whether a plaintiff can maintain a . . . cause of action for assault and battery [against a law enforcement officer] is the exact same test as the one used to analyze a Fourth Amendment excessive force claim." *Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013) (internal quotation omitted). However, under New York state law, unlike under federal law, "[i]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." *Id.* (internal quotation omitted).

Here, and as discussed below, the Court finds that Rhodes' arrest of Plaintiff was unlawful. Accordingly, under New York law, the force used against her was excessive and constituted an assault and battery. *Id.* Moreover, even assuming that the arrest had been lawful, the force used by Rhodes was unreasonable.

Determining whether the force used in effectuating an arrest was reasonable is a fact-specific, individualized inquiry that "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[T]he actions of the officers must be judged against the purported justification for the use of force under the circumstances and a defendant may be liable if the force used exceeded the force needed for the factual circumstances."

*Piper v. City of Elmira*, 12 F. Supp. 3d 577, 588 (W.D.N.Y. 2014) (internal quotation omitted). "This is particularly true where the circumstances of the encounter suggest that the officer 'gratuitously inflict[s] pain in a manner that [is] not a reasonable response to the circumstances.'" *Id.* (quoting *Phelan v. Sullivan*, 541 F. App'x 21, 24 (2d Cir. 2013)).

As set forth in more detail in its Findings of Fact, the Court has concluded, based on the evidence at trial, that: (1) Plaintiff did not flee when approached by Rhodes, but instead stood still; (2) Plaintiff did not attack Rhodes or resist arrest or otherwise act in a combative manner; and (3) Rhodes nevertheless pepper-sprayed Plaintiff, threw her against a wall, kneed her in the head, grabbed her hair, and slammed her head against the ground. The Government concedes that the Court could find that Rhodes' actions in striking and hitting Plaintiff constituted a battery (Dkt. 221 at 15), and the Court does indeed so find. There is no credible evidence that Rhodes' actions were in any way reasonable or warranted under the circumstances. Instead, his actions appear to have been a grossly out-of-proportion reaction to having cleared Leathers for entry, only for Arcuri to subsequently discover that Leathers was a drug smuggler. Plainly agitated by his failure to have discovered Leathers' illicit activities, Rhodes turned his aggression onto Plaintiff, who had the misfortune of being a nearby target. The force used by Rhodes was gratuitous and plainly unnecessary for any legitimate law enforcement purpose. *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010). Indeed, Zinnerman credibly testified that the force used by Rhodes rose to the level of deadly force (*see* Dkt. 211 at 21:14-22:7), which would have been justified only if Rhodes had probable cause

to believe that Zhao "pose[d] a significant threat of death or serious physical injury to [himself] or others." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (internal quotation omitted). Under these circumstances, the Court easily concludes that Rhodes committed an assault and battery on Plaintiff.

### C.    Plaintiff's False Arrest Claim

False arrest is an intentional confinement without consent and without justification. *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999). The elements of a claim for false arrest are: (1) Defendant intended to confine Plaintiff; (2) Plaintiff was conscious of the confinement; (3) Plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. 2 N.Y. P.J.I. 3:5. When it is shown that an arrest has been made without a warrant, a plaintiff will have established a *prima facie* case of false arrest and false imprisonment. *Barr v. Co. of Albany*, 50 N.Y.2d 247, 255 (1980). The Government concedes that under the circumstances presented here, Plaintiff has made out a *prima facie* case of false arrest. (Dkt. 221 at 16).

As a result, the burden shifts to Defendant to establish probable cause. *See Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999); *Raysor v. Port Auth. of New York & New Jersey*, 768 F.2d 34, 40 (2d Cir. 1985); *Rakidjian v. Suffolk*, 28 A.D.3d 734, 735 (2d Dep't 2006). Probable cause exists when an arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person. *Dzinanka v. Cty. of Suffolk*, 932 F. Supp. 59, 62 (E.D.N.Y. 1996). The existence of probable cause "turns

on an objective assessment of the officer's action in light of the facts and circumstances confronting him at the time." *Maryland v. Macon*, 472 U.S. 463, 470 (1985) (internal quotation omitted). Probable cause may exist even if it is based on mistaken information, so long as the officer acted in good faith and in reasonable reliance upon that information. *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

The Government argues that Rhodes had probable cause to believe Plaintiff and her companions were involved in drug smuggling, based upon his testimony that Arcuri instructed him to get the women who had come through with Leathers. (Dkt. 221 at 17). The Court rejects this argument because Rhodes' testimony on this point was not credible. Arcuri denied ever having told Rhodes that Plaintiff and her companions had accompanied Leathers and, to the contrary, stated that it was Rhodes who claimed they had. (Dkt. 228 at 49:18-50:3, 62:16-18). Arcuri also testified that Leathers repeatedly stated that he was traveling alone. (*Id.* at 61:18-22). Arcuri's testimony in this regard was credible, and the Court credits it. Under these circumstances, the Court cannot and does not find that the Government has born its burden of demonstrating that Rhodes had probable cause to arrest Plaintiff. Accordingly, the Court therefore finds in Plaintiff's favor with respect to liability on her false arrest claim.

## IV.    Damages

Having found in Plaintiff's favor with respect to liability on her assault and battery and false arrest claims, the Court must determine what damages Plaintiff is entitled to collect. "Courts are not required to provide lengthy analyses in support of their damages findings but they are required under Fed. R. Civ. P. 52(a) to adequately explain the

subsidiary facts and methodology underlying the ultimate finding." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 622 (2d Cir. 2006) (internal quotation omitted). Accordingly, the Court will set forth the rationale for its damages determination below.

## A. Damages for Assault and Battery

Generally speaking, the damages available under the FTCA are determined by state law, with the exceptions that pre-judgment interest and punitive damages are not available. *See Molzof v. United States*, 502 U.S. 301, 305 (1992). In New York, a plaintiff who prevails on a battery claim may recover compensatory damages, and "[b]oth pecuniary and nonpecuniary losses—such as emotional pain and suffering and loss of liberty—are compensable under New York law." *Wright v. Musanti*, No. 14-CV-8976 (KBF), 2017 WL 253486, at *11 (S.D.N.Y. Jan. 20, 2017). It is Plaintiff's burden to "present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages." *Makinen v. City of N.Y.*, 167 F. Supp. 3d 472, 497-98 (S.D.N.Y. 2016) (internal quotation omitted).

### 1. Past Medical Expenses

"It is hornbook law that a plaintiff may recover reasonable past and future medical expenses incurred as a result of an injury." *Buckley v. Metro-N. Commuter R.R.*, 79 F.3d 1337, 1347 (2d Cir. 1996), *reversed on unrelated grounds by Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424 (1997). Here, the Court has found that Plaintiff established

$64,313.18 in past medical expenses,[9] paid by the Crime Victims Board. Accordingly, the Court awards Plaintiff this full amount.

## 2.  Future Medical Expenses

Plaintiff may recover for future medical expenses only if she proves with "reasonable certainty" that they will be required as a result of her injuries. *See, e.g., Huff v. Rodriguez*, 45 A.D.3d 1430, 1433 (4th Dep't 2007). Here, and as discussed at length in the Court's Findings of Fact, Plaintiff has failed to prove her claimed future medical expenses with reasonable certainty.

Because the only permanent injuries Plaintiff suffered as a result of the incident were her back injuries, the Court considers only whether Plaintiff has shown that she will require future medical services related to those injuries and concludes that she has not. Dr. Gutstein testified that individuals with back injuries like those suffered by Plaintiff learn to live with them and that ongoing treatment is not necessary or required. While Dr. Gutstein testified that he would recommend that Plaintiff see a neurologist once a year to monitor her spine, the Court did not find that testimony credible because Dr. Gutstein had never previously made such a recommendation. The Court further found Dr. Gutstein's testimony that Paxil and Klonipin could be helpful in treating Plaintiff's back injuries speculative. Plaintiff produced no other evidence of future medical expenses related to her back injuries, and has therefore failed to establish her entitlement to an award of future medical expenses.

---

[9]     This figure also includes $2,514.18 in lost earnings. (See Trial Exhibits 155 & 217). As noted at pages 55-56, *infra*, the Court has taken this into account in its award of lost wages.

### 3. Pain and Suffering

"In New York, the trier of fact may award a prevailing plaintiff damages for non-economic losses sustained as a result of the injury and its concomitant conscious pain and suffering, including the loss of enjoyment of life." *Robinson v. United States*, 330 F. Supp. 2d 261, 293 (W.D.N.Y. 2004). "There is no precise rule for fixing the value of non-economic damages. Instead, the trier of the facts must determine the value from all of the evidence in the particular case." *Id.* "Damage awards in analogous cases provide an objective frame of reference, but they do not control [the Court's] assessment of individual circumstances." *In re Air Crash Near Nantucket Island, Mass., on Oct. 31, 1999*, 307 F. Supp. 2d 465, 469 (E.D.N.Y. 2004) (internal quotation omitted).

Here, the Court has found that Plaintiff was attacked by Rhodes and suffered from immediate physical injuries, including head and facial injuries, eye injuries, knee injuries, shoulder injuries, and back injuries. (*See* page 22, *supra*). Plaintiff's back injuries are permanent, while her other injuries have resolved. The Court has surveyed similar excessive force/assault and battery cases, including, but not limited to, the following: (1) *Dixon v. Agbai*, No. 15 Civ. 850 (AT)(AJP), 2016 WL 3702749, at *7 (S.D.N.Y. July 8, 2016), *report and recommendation adopted*, 2016 WL 5660246 (S.D.N.Y. Sept. 28, 2016) (awarding $250,000 in compensatory damages to the plaintiff where correction officer kicked him in the head and "stomped" his head into the ground, causing him to lose teeth and to suffer permanent difficulty eating); (2) *Reynolds v. State*, 118 A.D.3d 1496, 1496 (4th Dep't 2014) (upholding award of $225,000 for past pain and suffering and $475,000 for future pain and suffering where the plaintiff was subjected to excessive

force by New York State Troopers and suffered a closed head injury and herniated discs as a result); (3) *Lewis v. City of Albany Police Dep't*, 547 F. Supp. 2d 191, 203, 206-09 (N.D.N.Y. 2008) (upholding $65,000 award where the plaintiff was on the ground in handcuffs and officer stepped on plaintiff's head "with his full weight and ground [the] plaintiff's face into the pavement," causing "abrasions and a contusion to his face and a closed head injury"); (4) *Rangolan v. Cty. of Nassau*, 370 F.3d 239, 246 (2d Cir. 2004) (upholding award of $300,000 in past pain and suffering and $500,000 in future pain and suffering where the plaintiff was beaten by another inmate and suffered head injuries that left him in a coma for six days, necessitated surgery, and caused ongoing seizures); (5) *Thompson v. Hickey*, 283 A.D.2d 939, 940 (4th Dep't 2001) (finding $25,000 in past pain and suffering and $25,000 in future pain and suffering where the plaintiff suffered recurrent disc herniation and had to undergo back surgery as result of assault, but had pre-existing back problem); and (6) *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (affirming $216,000 award for excessive use of force where officer struck the plaintiff with a blunt object that fractured his cheekbones and required plastic surgery under general anesthesia, leaving the left side of his face permanently numb). The Court has listed the amounts actually awarded in each of these cases, but has taken into account "their present dollar value adjusted for inflation" in making its determination. *See Dixon*, 2016 WL 3702749, at *5 n.3.

Having considered all the evidence of record, the awards made in comparable cases, and the specific factual circumstances of this case, including the Court's conclusion that the vast bulk of Plaintiff's damages were incurred during the actual

incident, the Court concludes that an award of $260,000 for past pain and suffering and $125,000 for future pain and suffering is appropriate in this case. The Court finds that these amounts are sufficient to reasonably compensate Plaintiff for her pain and suffering and the concomitant loss of enjoyment of life.

The Court notes that the parties have raised a question regarding the applicability of § 5041 of the New York Civil Practice Law and Rules ("CPLR 5041"), "which requires that for future damages in excess of $250,000, the court is to enter judgment for the present value of an annuity contract that will provide for the payments of the remaining amounts of future damages in periodic installments." *Estevez v. United States*, 74 F. Supp. 2d 305, 306 (S.D.N.Y. 1999) (internal quotation omitted). The Court need not decide whether federal courts are required to follow CPLR 5041 in FTCA cases because it has not awarded future damages in excess of $250,000.

### 4.     Lost Wages and Business Losses

"[P]laintiff has the burden of proving loss of earnings with reasonable certainty." *Seargent v. Berben*, 235 A.D.2d 1024, 1024 (3d Dep't 1997). As discussed above in resolving Defendant's motion in limine, the Court has found that Plaintiff was unable to work for three months as a result of Rhodes' attack and that she has shown with reasonable certainty that her salary at that time was ¥ 12,000. The evidence of record indicates that in July 2004, the exchange rate for Chinese yuan to U.S. dollars was 1:8.27. (*See* Trial Exhibit 553). Accordingly, Plaintiff's monthly earnings of ¥ 12,000 were the equivalent of $1,451.03. Plaintiff is therefore entitled to recover $4,353.09 in lost earnings. However, the Court notes that the amount the Crime Victims Board paid

Plaintiff included $2,514.18 in lost earnings. (*See* Trial Exhibits 155 & 217). Plaintiff cannot recover twice for the same damages. *See, e.g.*, *Phelan v. Local 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Can.*, 973 F.2d 1050, 1063 (2d Cir. 1992) ("A plaintiff may not recover twice for the same injury."). The Court therefore reduces Plaintiff's past lost earnings award to $1,838.91.

### B.      False Arrest Damages

"An individual subjected to a false arrest is entitled to two types of compensatory damages: (1) for loss of liberty and (2) for physical and emotional distress." *Thomas v. Kelly*, 903 F. Supp. 2d 237, 262 (S.D.N.Y. 2012). Damages may be awarded for false arrest only for the period from initial custody until arraignment or release. *See Hygh*, 961 F.2d at 366. The Court may award "reasonable compensation for the humiliation and embarrassment suffered by [the] plaintiff as a result of [her] prearraignment incarceration, based on [her] false imprisonment." *Landow v. Town of Amherst*, 49 A.D.3d 1236, 1237 (4th Dep't 2008).

Here, the Court has already accounted for the claimed physical injuries and psychological distress suffered by Plaintiff as a result of Rhodes' actions in its award on Plaintiff's assault and battery/excessive force claim. "[W]hen a plaintiff seeks compensation for the same damages under different legal theories of wrongdoing, the plaintiff should receive compensation for an item of damages only once." *Gentile v. Cty. of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991) (agreeing that party could not recover duplicative damages for both malicious prosecution and unlawful arrest claims, but finding that the jury's award reflected distinct damages on each claim); *see Dancy v.*

*McGinley*, No. 11 CV 7952 (LMS), 2015 WL 13214324, at *10 (S.D.N.Y. May 11, 2015) ("[T]he physical injuries discussed above in determining the damages for [the plaintiff's] excessive force claim cannot be counted towards [the plaintiff's] false arrest claim."), *aff'd*, 843 F.3d 93 (2d Cir. 2016). As a result, the Court awards Plaintiff damages only for the loss of her liberty and her humiliation and embarrassment, without regard to her claimed physical injuries.

Plaintiff's detention in this case was no longer than 45 minutes, as measured from the time of Rhodes' attack to the time the ambulance departed the Rainbow Bridge. Although Plaintiff claims to have been humiliated by her false arrest, the Court, as set forth at length above, does not find Plaintiff credible and therefore does not consider her descriptions of her claimed humiliation reliable or sufficient to prove actual damages. However, that does not mean that Plaintiff cannot recover something for her false arrest. Generally speaking, New York Courts will uphold awards "of up to $10,000 for . . . short periods of confinement without proof of actual damages." *Dancy*, 2015 WL 13214324, at *10 (internal quotation omitted). Here, the Court finds that an award of $10,000 is sufficient to reasonably compensate Plaintiff for the loss of her liberty and her embarrassment/humiliation. *See id.*; *Landow*, 49 A.D.3d at 1237 (holding that an award of $10,000 "does not deviate materially from what would be reasonable compensation for the humiliation and embarrassment suffered by plaintiff as a result of his prearraignment incarceration, based on his false imprisonment," where prearraignment incarceration lasted for four hours).

## CONCLUSION

For the reasons set forth above, the Court finds that Defendant is liable to Plaintiff for Rhodes' assault and battery and false arrest. The Court finds that Plaintiff is entitled to recover $64,313.18 in past medical expenses, $1,838.91 in past lost earnings, $260,000 in past pain and suffering, $125,000 in future pain and suffering, and $10,000 for false arrest, for a total recovery of $461,152.09. The still-pending portions of the parties' motions in limine (Dkt. 131; Dkt. 134; Dkt. 137) are resolved as follows: (1) Defendant's request that Plaintiff be prohibited from seeking past lost wages for the three months directly following the July 21, 2004 incident is denied; and (2) all other outstanding requests are denied as moot or were otherwise resolved during the trial. The Clerk of the Court is instructed to enter judgment in favor of Plaintiff and to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      August 4, 2017
            Rochester, New York